Filed 6/4/14  P. v. Riley CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATHEW DAVID RILEY,<br><br>    Defendant and Appellant. | C070173<br><br>(Super. Ct. No. 08F10298) |

A jury convicted defendant Mathew David Riley of murdering his parents, Steven and Linda Riley.[1]  (Pen. Code, §§ 187 [murder], 190.2, subd. (a)(3) [special circumstance of multiple murders].)[2]  The jury also found defendant used a knife in the commission of the murders.  (§ 12022, subd. (b)(1).)  The trial court sentenced defendant to serve consecutive sentences of life in state prison without possibility of parole, plus an

---

[1]    Due to shared surname, we refer to members of the Riley family by their first names.

[2]    Undesignated statutory references are to the Penal Code.

1

additional two years for the weapon enhancements. In addition to other fines and fees, the trial court imposed a $5,000 parole revocation restitution fine under section 1202.45.

On appeal, defendant contends (1) the trial court erred in allowing his wife, Jannilin Overton, to testify she believed he was guilty and she was willing to wear a secret recording device to capture their conversations, (2) his right to a fair trial was denied by the admission of evidence he and Overton viewed bestiality pornography in the hours before the victims were murdered, and he was further prejudiced by the prosecutor's repeated references to beastiality and beastiality pornography during closing arguments, and (3) the prosecutor committed misconduct during his rebuttal argument by stating the defense would have been allowed to present evidence someone other than defendant committed the murders if such evidence existed. The Attorney General points out the parole revocation restitution fine (§ 1202.45) was improperly imposed because defendant's sentence does not include a period of parole.

We conclude the trial court did not err in allowing Overton to testify about her belief in defendant's guilt because the court limited this testimony's use to establishing her state of mind. Testimony by Overton that she was willing to wear a wire was properly introduced by the prosecution to bolster the credibility of Overton's trial testimony and refute her prior contradictory statements. As to Overton's testimony regarding viewing bestiality pornography, we conclude this testimony was not prejudicial to the defense. Further, defendant's contention regarding prejudice from the prosecutor's references to beastiality and beastiality pornography during closing argument is forfeited for lack of a timely objection. Regarding defendant's contention the prosecutor committed misconduct during his rebuttal argument, we conclude the prosecutor did not mislead the jury about defendant's ability to introduce nonspeculative evidence of third-

2

party culpability.  We strike the fine imposed under section 1202.45, but affirm the judgment in all other respects.

BACKGROUND

***Testimony about Defendant's Problems with Steven and Linda***

Several witnesses testified defendant was having problems with his parents, Steven and Linda, during the weeks before their deaths.  After living with Steven and Linda for a few months in the summer of 2008, defendant moved into an apartment in which Overton and his children were living.

Sometime during November 2008, William Stumpf –- a long-time friend of Steven and Linda –- had dinner with Steven when the conversation turned to defendant.  Steven related that defendant and Overton were having marital difficulties and were being evicted from their apartment.  Steven's coworker, Philip Park, recalled Steven frequently complained about having problems with defendant.  Among other complaints, Steven "was extremely disappointed that his son didn't hold down the job that he eventually got when he was living at home with him."  Steven vowed defendant was not going to be allowed to move back in with him and Linda.

Linda's best friend, Marta Boeger, testified that around Thanksgiving in 2008, Linda told her she would not allow defendant or Overton to move back into the house.  Linda stated defendant and Overton's children could live with her and Steven, but defendant "and Janni could live in their car for all she cared."  Linda was uncharacteristically agitated when making the statement.  She was upset defendant had recently turned down a job offer.

In late November 2008, the apartment complex at which defendant and Overton lived was engaging in eviction proceedings against them.  At the time, defendant and Overton were having "financial, communication, and other difficulties" in their

3

relationship. Defendant was "emotionally dead" to her. If they lost the apartment, Overton planned to live with the children at KISS House –- a transitional living facility for women and children where men were not allowed. Overton testified for her and defendant, it was a time of "extreme" stress.

### Defendant's Absence from his Apartment at the time of the Murders

The People's theory of the case was defendant murdered Steven and Linda sometime between 4:00 and 7:00 a.m. on December 9, 2008; staged the crime scene as if it had been a home invasion burglary; and pretended to discover their bodies later that afternoon after cleaning his clothes and the crime scene.

Overton testified defendant left their apartment around 3:00 a.m. on December 9, 2008, and did not return until 7:30 or 8:00 a.m. When defendant returned to the apartment, Overton found it unusual he had donuts from a donut shop located between their apartment and Steven and Linda's house rather than the usual donuts from the nearby supermarket.

When defendant pulled up, his car had no frost on it even though all of the other parked cars in the neighborhood had frost on them.

Defendant was wearing his work boots and a gray long-sleeve shirt under a red sports shirt. Overton immediately asked him where he had been. Defendant changed out of his clothes, then "did laundry right away." This struck Overton as unusual "[b]ecause he never did laundry[,] especially in the morning." Defendant was behaving so strangely Overton sniffed his shirt for perfume before he took it to the laundry. Overton thought defendant's unexplained absence suggested he was having an extramarital affair. Overton's suspicions were heightened when she observed defendant had a mark on his left eye. To Overton, the injury looked "like a cut that had a little bruising around it."

4

Overton testified her daughter was incapable of leaving the kind of scratch found on defendant's face.

Overton never saw defendant wear his work boots again. Defendant's boots were later found on the roof of defendant's apartment complex.

During the day of the murders, defendant and Overton ran errands with Overton's mother in preparation for their eviction. Defendant told Overton's mother he planned to live with Steven and Linda after the eviction. At 3:15 p.m., defendant announced he was "going to go down to talk to his mom about moving in; that he could not put it off any longer." Overton was not feeling well and asked defendant to stay. However, he left shortly thereafter.

### Discovery of Steven and Linda's Bodies

At approximately 4:40 p.m. on December 9, 2008, Sacramento Police Officer Justin Hanks and two other police officers responded to Steven and Linda's house. Officer Hanks observed defendant sitting on the front porch smoking a cigarette and crying. As one of the investigating officers explained, the bloody body of Steven was visible "right away" when walking in the front door. There was "a whole lot of blood" evident. Sacramento Police Department Detective Kyle Jasperson thought it would be "highly unlikely" anyone would enter the house and not notice Steven's body and blood before entering the kitchen.

Upstairs, Officer Hanks discovered Linda's body in the master bathroom, also in a pool of blood. Some of the blood from the bodies was already dry, and some was still wet to the touch.

Autopsies of Steven and Linda confirmed they had been stabbed to death. Steven was found in a blood-soaked bathrobe with holes corresponding to the stab wounds on his body. He had 20 "sharp force injuries," of which 16 were stab wounds. Steven's nose

5

had been nearly cut off, and one of the stab wounds penetrated nearly six inches and broke a rib bone. The injuries would have caused Steven to die within minutes.

Linda was found lying on her back in a short nightgown in a pool of blood. She had 19 sharp force injuries, of which 17 were stab wounds. The stab wounds covered her head and upper body. One stab wound was seven inches deep. Some of the wounds were found on her hands and were classified as defensive injuries. Linda most likely died from bleeding within a few minutes.

### *Defendant's Statements*

Later on the day Steven and Linda's bodies were discovered, defendant was questioned at the police station by Detective Jasperson. Defendant, who was not under arrest at the time, gave the following statements to the police: At 8:00 a.m. on December 9, 2008, defendant called his mother but she did not pick up the phone. Later in the day, defendant's daughter called the same number by accident.

Defendant arrived at his parents' house around 4:20 p.m. Defendant used his key to unlock the front door and then "kinda poked around in there." Knowing his parents' schedules, defendant did not expect either of them to be home from work yet. Defendant planned to read a book while waiting. Not finding anything to read, defendant headed to the kitchen for a drink of water. While walking to the kitchen, defendant saw Steven's body. Defendant tried to call 911, but the telephone had no dial tone. Defendant went to his car and used his cell phone to call the police. While on the phone, defendant ran upstairs and discovered Linda's body. Defendant got on his hands and knees, approaching Linda's body close enough that he might have bumped her head.

Defendant did not want to follow the directions of the emergency dispatcher to give his father CPR. Defendant stated he "might have nudged" Steven's body.

6

Defendant stated he had planned to talk to his parents about moving back into their house after his eviction. He admitted he and his mother had not always seen "eye-to-eye" and she disapproved of how he and Overton "screw up everything we do." But defendant asserted his relationship with Linda had been getting better and he and Steven got along "fine." Defendant could not think of anyone who would have wanted to hurt Steven or Linda.

Defendant denied having anything to do with his parents' deaths. He explained his eye was bruised when his infant daughter grabbed him. Defendant attributed the cut on his finger to "a paper cut" from the inside of box.

When asked about his work boots, defendant stated he did not have them anymore. During a later conversation with the police, he indicated he had discarded them months earlier. When defendant denied having the boots, Overton immediately started crying.

### *Forensic Evidence*

Investigating the crime scene at Steven and Linda's house, the police discovered a window in the downstairs bedroom was open with the screen lying outside the house. A dirty footprint was on the floor. A broken glass picture frame was lying in a hallway.

The police interviewed Steven and Linda's neighbors who all reported they had not heard nor seen anything unusual on the day of the murder. Police officers searched Steven and Linda's backyard but did not find anything unusual other than a screen that had been pushed out from the downstairs bedroom window.

Detective Jasperson believed the crime scene had been "staged." His opinion was based on the lack of any sign of forced entry –- the downstairs bedroom had an open window with a drawstring on the outside that indicated someone exited by the window. Also, there were "numerous valuable items, large and small, around the house, which did not appear to have been disturbed or moved in any way." For example, the police

7

observed a laptop computer, a large-screen television, a stereo system, and power tools that were openly visible.  They also collected a woman's wallet, keys, and jewelry boxes.  Steven's wallet was found in a pair of pants on the floor of the master bedroom.  Supervising forensic investigator Vanessa Ciarnelli also found it incongruous that some of the rooms appeared ransacked, some untouched, and valuable items favored by burglars remained in plain sight.

In numerous locations on the first and second floors, the police found "what appeared to be footprints with a fabric pattern [that] appeared to be in blood."  The footprints were consistent with someone in sock-clad feet being "near some kind of a struggle."  Some of the footprints led to a wash tub located in the laundry room.  Blood was found on the edge of the wash tub, and "diluted stains" inside suggested that "[p]erhaps someone was rinsing blood . . . in this area."

The forensic team noticed the footprints left at the murder scene were left by someone whose small toes sometimes did not imprint.  Exemplar footprints given by defendant were consistent with the footprints left at the crime scene.  The prosecution's expert witness opined that "well under one percent" of the population would have produced such footprint impressions.  At trial, a neighbor noted Steven and Linda were accustomed to taking their shoes off in their house.

Fingerprint analysis indicated defendant's right palm left an impression on the interior of the downstairs bedroom window –- the window the police had discovered was open.  Other prints taken from the front door, master bedroom, and laundry room lacked sufficient clarity to allow identification.  Nonetheless, some of the prints were compared to those in the database of persons fingerprinted in California, but no matches were found.

A swab was taken of "reddish material" found in three places on the steering wheel cover of defendant's car that tests indicated to be blood. A tiny amount of blood was also discovered on the floor mat. However, DNA testing of the samples from the car was inconclusive. Blood matching Steven's profile was found on the bottom of the jeans defendant was wearing when arrested. Blood was also found on defendant's Converse shoes. Blood from the bottom of the shoe did not yield any DNA, likely because the samples were quite small. The prosecution's criminalist testified the small amounts of blood found on the bottom of defendant's Converse shoes were inconsistent with how much blood she expected to find based on statements by the defendant that he had walked around the house and approached Steven and Linda's bodies before calling 911.

Based on the time recorded by a home security camera of a neighbor across the street from Steven and Linda's home, defendant was in their house for seven minutes before he called 911.

In January 2011, a roofing contractor found defendant's work boots on the roof of the apartment complex where he and Overton had been living at the time of the murders. The roofing contractor thought "somebody just threw the pair up all at one time because they landed in relatively close proximity to each other." A criminalist examined the boots and found animal hairs inside. Some of the hairs appeared to be consistent with those of one of the dogs belonging to Steven and Linda. A reddish-brown substance that tested positive for blood was found in the depressions of the soles of the boots.

### *Defendant's Attempted Suicide*

At 2:00 a.m. on December 11, 2008, Placer County Deputy Sheriffs responded to defendant's apartment. Inside the apartment, they found defendant with three- to four-inch vertical cuts on his wrists. Defendant told the deputies, "I'm upset because Sac keeps harassing me about killing my parents." In the bathroom, the deputies found a

9

bathtub that was three-quarters full with water and blood. At the hospital, defendant "also mentioned that he wanted the focus to be off of his wife, and he was also upset about his car being impounded." Defendant was worried, explaining that "[w]hen he found his parents dead, he went back to his vehicle to call the police, and that was why there was blood found in his vehicle." Defendant was "lethargic" due to blood loss but still coherent.

### *Defense Evidence*

The defense called forensic scientist Marc Taylor to rebut testimony by the prosecution's forensic investigator that she would have expected more blood on defendant, given his proximity to the victims' bodies. Taylor noted Steven and Linda's bodies were found in pools of blood, much of which had dried. Compared to wet blood, dried blood is picked up much less readily by contact and is more easily worn off from clothing.

Dr. Robert Lawrence, a pathologist for the coroner's office in San Joaquin County, testified about the bruising observed under defendant's eye on the day of the murders. Dr. Lawrence stated it was "a reasonable medical certainty" that the observed "discoloration would occur in two to four days, and certainly more than one day" after the injury.

A custodian of records for defendant's cell phone carrier testified about information pertaining to defendant's cell phone use on December 9, 2008. Using data from the carrier, the custodian determined all of the calls on that date were placed from the Auburn/Roseville area, where defendant's apartment was located, until the 911 call placed from the victims' house. On cross-examination, the custodian stated the carrier does not track a phone's location other than when there is an incoming or outgoing call. Also, when the cell phone is turned off, it is not tracked.

10

The defense called several witnesses to testify about defendant's peaceable character. William Stumpf testified he had known defendant since defendant was a child and had never seen him get violent, raise his voice, or even become angry. Defendant's sister, Danielle Riley, opined that defendant is a "passive person." Linda's sister, defendant's aunt, Angela Amundson, testified defendant is "just a gentle person that wouldn't think of hurting other people." Laurence Nichols, Linda's father and defendant's grandfather, stated he had spent a great deal of time with defendant throughout his life. Nichols considered defendant to be a very passive person and it was "[t]otally impossible" for him to have killed Steven and Linda. Nichols denied he told Overton how to testify at the preliminary hearing, or that he had threatened her in any way.

Danielle further testified that on the Sunday before the murders, Steven, Linda, defendant, Overton, the grandchildren, and Danielle had dinner together and decorated a Christmas tree. Afterward, Danielle and Linda went for a walk. They talked about defendant moving back into the house with Steven and Linda, and Linda "was fine with it."

Steven and Linda's will had a provision that neither of their children would inherit any money before his or her 40th birthday. Steven and Linda told Danielle about this provision and also told her they had informed defendant of the same. When the defendant and Danielle turned 40, each was to receive half of Steven and Linda's estate.[3]

---

[3] During his interview with Detective Jasperson, defendant stated he was born on December 24, 1977. Thus, defendant was two weeks shy of his 31st birthday on the day of Steven and Linda's murders.

11

The People and defense stipulated defendant had no prior criminal record, and he was terminated early from the United States Navy with an honorable discharge in 1998 for failing to comply with rules and regulations.

DISCUSSION

# I

### *Evidence of Overton's Belief in Defendant's Guilt*

Defendant contends the trial court should have excluded testimony by Overton that she believed him to be guilty and she had worn a concealed device to record conversations with defendant. Defendant argues this testimony was irrelevant and inflammatory. We are not persuaded.

### A.

### *Overton's Testimony*

Overton was a powerful yet problematic witness for the prosecution. Ultimately, her testimony at trial established defendant had no alibi from 3:30 a.m. until 7:30 a.m. on December 9, 2008 –- the time period within which Steven and Linda were murdered. Overton's testimony also showed defendant lied in an effort to convince the police he had long ago discarded the boots he wore at the crime scene. She also relayed her impression defendant was "[reeking] of guilt" when he came home after the time the murders were committed. However, Overton's credibility as a witness was undermined by her drug addictions. At the time of trial, she claimed to have been sober from methamphetamine for only 17 days.

Moreover, the prosecution had to contend with her prior inconsistent statements concerning defendant's whereabouts at the time of the murders. The People's trial brief noted the problem that, at the preliminary hearing, Overton gave two very inconsistent versions of the events on the night of December 8 to 9, 2008. First, Overton stated she

12

went to bed shortly before midnight on Monday, December 8, 2008, in the bedroom where she and the two children slept. Overton did not see defendant until the next morning when he brought home donuts and energy drinks. There was no frost on his car even though there was frost on other cars in the neighborhood. She observed defendant was wearing his work boots and had a scratch under his left eye. Defendant washed his clothes when he got home, which was unusual because defendant did not normally do laundry.

On cross-examination during the preliminary hearing, Overton stated she might have been confused about whether these events happened on December 8 or 9, 2008. She then stated she went to bed with defendant shortly before midnight, and they slept together in the same bed until about 5:30 a.m. Upon further examination, Overton allowed she and defendant might not have gone to bed together until 3:00 or 4:00 a.m. She then stated she had sex with defendant around that time after they visited a pornography site on the Internet. When examined by the prosecution, Overton explained she and defendant had visited only one Website, a bestiality pornography site, at 2:45 a.m. After watching the pornography for 45 minutes, they had sex for approximately 45 minutes, then went to bed together after smoking a cigarette outside.

Prior to trial, the prosecution indicated it would introduce evidence Overton "agreed to confront Defendant with a secret hidden recorder about the boots. . . . Overton hid a recording device in her bra and went and spoke privately to defendant about what he had done with the boots." She wore the recording device while she and several detectives spoke with defendant. The detectives then left and Overton continued to record their private conversation.

The defense opposed the introduction of the secretly recorded conversation, arguing: "The defense objects because her wearing the wire is not relevant for any

13

purpose and further runs the risk of confusing the jury or having them speculate about privileged matters." At a hearing on the issue, defense counsel suggested "the safer way" to elicit testimony about the secret audio recording made by Overton would be to question the police officers about it. Defense counsel added: "I still have concerns [about] what the jury will make of that. I think otherwise we're doing a pretty good job of not making it obvious to the jury that there were privileged communications that are being withheld from them. The moment you do make that suggestion is the moment that speculation runs [amuck]." The prosecutor responded that the evidence was "extremely probative" because "the fact that the woman who is the alibi witness for her husband is willing to stick a recorder in her bra is very powerful evidence that she is not an alibi witness to her husband."

The trial court ruled the prosecution could elicit testimony Overton was willing to wear a secret recording device, but without reference to the content of the recording or any reference to a discussion about defendant's boots. The trial court also ruled the prosecution could ask Aaron Echols, a KISS House employee, "about statements where [Overton] thought it was possible for the defendant to have killed or that he may have killed [Steven and Linda]. [¶] Because I think that impeaches her prior statements –- inconsistent statements."

During trial, the prosecution played the audio track Overton had secretly recorded at the request of the investigating officers. In that audio track, Detectives Vigon, Higgins, and Jasperson accompanied Overton to ask defendant again about the location of the boots a neighbor had seen defendant wearing on the morning of the murders. Defendant repeated his earlier assertions he had "chucked them" a "while ago." The audio recording did not include any of the private conversation between Overton and defendant after the detectives departed.

14

The People also elicited the following testimony from Detective Vigon:

"Q. [Prosecutor]: Detective Vigon, is that a recording of the interaction that was had between [defendant] while his wife . . . was there with the digital recorder secreted on her?

"A. Yes.

"[¶] . . . [¶]

"Q. And at some point I think it's Detective Higgins who says to [defendant]: 'One of you guys got rid of them. Someone got rid of them yesterday morning. It's either her or it's you,' correct?

"A. That's correct.

"Q. The detective that was referring at that time –- I think it was Detective Higgins is saying that to either [of] you, [defendant] got rid of those boots, or . . . Overton, got rid of those boots?

"A. That is who he was referring to, yes.

"Q. And at that point [Overton] is the one who has told you [defendant] had the boots on the day before, correct?

"A. Yes.

"Q. And she is willing to actually put on a tape recorder inside of her, around her, so she can go in and get information with you guys –-

"A. That's correct."

Overton's conflicting statements about defendant's whereabouts at the time of the murder featured prominently at trial. The prosecutor asked about Overton's lies to the police officers when they first contacted her and she sought to protect defendant.

The defense also cross-examined Overton about her initial statement she had been with defendant the entire night when the murders took place. At the time, Overton had

15

no intention to split up from defendant. Thus, she lied because she "was protecting him." A year later, Overton told the police she had never said defendant had been sleeping with her on the night of the murders. At trial, Overton explained that during that conversation with the police: "I was scared because I knew I lied to cover up for my husband."

The defense also cross-examined Overton about her conflicting testimony at the preliminary hearing. Overton acknowledged the preliminary hearing was the first time she stated she had sex and watched pornography with defendant on the night of the murders. Overton stated she had not revealed that information earlier because she "was more embarrassed by the facts and, um, the content" of the pornography. And, Overton acknowledged "there were two different versions at the preliminary hearing; one about being with [defendant] all night, sleeping in the same room, waking up, him being there; and the second version was, hey, I woke up. He was gone, and then he came back with donuts." After the preliminary hearing, Overton explained she once again attempted to cover for defendant because she was intimidated by defendant's grandfather. Overton also admitted she had lied under oath at the preliminary hearing and at other times.

On redirect, the prosecution sought to rehabilitate Overton's testimony about defendant's absence from their apartment at the time of the murders by eliciting the following testimony from Overton:

"Q [Prosecutor]: Did you tell Aaron Echols that you know you lied at the preliminary hearing because you believed, in your mind, that [defendant] had in fact killed his parents?

"[Defense counsel]: Objection. Improper argument.

"[Prosecutor]: It's not offered for the truth. Offered for mindset.

"THE COURT: Let me just read the question. [¶] Overruled.

"[Defense counsel]: Could we have a limiting instruction on the use of that?

16

"THE COURT:  All right.  For the jury to understand, she has no personal knowledge as to the facts of the case.  This is only relevant as to her state of mind.  [¶] The People are willing to stipulate that she has no personal knowledge.

"[Prosecutor]:  As to –-

"THE COURT:  As to –-

"[Prosecutor]:  -- whether in fact he did not kill them.  Yes, she had personal knowledge of the facts of the case.

"THE COURT:  Right.

"[Prosecutor]:  But not as to –

"THE COURT:  By not being physically present at the death of Linda and Steven Riley, she has no personal knowledge.  She was not at the scene.

"[Prosecutor]:  Correct.  Understood.

"THE COURT:  So the question, I'll let you re-ask it, only to establish the effect on her –

"[Prosecutor]:  Her mindset.

"THE COURT:  -- on her mindset, this witness.  Re-ask your question.

"[Prosecutor]:  . . .  Do you know Aaron Echols?

"A  [by Overton]  Yes.

"Q  And is he someone that works at Kiss House?

"A  Yes.  Not at [present] but he did.

"Q  Then.  After the preliminary hearing, after you testified, did you tell Aaron Echols that you know you lied at the preliminary hearing because you believe in your mind that [defendant] did in fact kill his parents?

"A  Yes.

"Q  And why would you tell . . . Echols that?

17

"A   Because I'm not good at math but I can add two plus two.

"Q   What do you mean by that?  That's similar to what you told Detective Vigon and Detective Higgins.

"A   Yes.  Because, because –- mainly because when Matt showed up –

"[Defense counsel]:  Object.  This is all speculation.

"THE COURT:  Overruled.  [¶]  You can respond.

"THE WITNESS:  I observed Matt [reeking] of guilt.

"[Prosecutor]:  When in time?

"[Defense counsel]:  Objection.

"THE WITNESS:  On Tuesday.

"THE COURT:  Overruled.

"THE WITNESS:  On Tuesday night.  And that's when I asked him if he was cheating on me because he was acting so weird is basically the only way I can put it. And the only thing I could come up with in my mind was that he was with somebody else."

## B.

### *Overton's Testimony about her Belief in Defendant's Guilt*

Defendant argues Overton's testimony about her belief in defendant's guilt was irrelevant, inadmissible, and prejudicial.

In considering defendant's argument, we adhere to the well-settled principles that "[t]he trial court is vested with broad discretion in determining the admissibility of evidence.  (*People v. Karis* (1988) 46 Cal.3d 612, 637.)  This is particularly true where, as here, underlying that determination are questions of relevancy, the state of mind exception to the hearsay rule and undue prejudice.  (*People v. Rowland* (1992) 4 Cal.4th 238, 264.)  The lower court's determination will be reversed only upon a finding of

abuse. (*People v. Edwards* (1991) 54 Cal.3d 787, 820; *People v. Karis*, *supra*, at p. 637.)" (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 386.) Nonetheless, the trial court lacks discretion to allow inadmissible evidence over the objection of counsel. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1118.)

As to testimony regarding a witness's belief a defendant committed the charged offenses, the California Supreme Court has explained that "[a] witness may not express an opinion on a defendant's guilt. (*People v. Torres* (1995) 33 Cal.App.4th 37, 47; *People v. Brown* (1981) 116 Cal.App.3d 820, 827–829.) The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. (*Torres, supra*, at p. 47; *Brown, supra*, at pp. 827–828; see Evid. Code, § 805.) 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' (*Torres, supra*, at p. 47.)" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.)

Here, however, Overton's testimony regarding prior statements about believing defendant to be guilty was not admitted for the truth of her prior expressions but to establish her state of mind. Thus, the trial court instructed the jury it could not use Overton's answer for any purpose other than to establish her state of mind. As an expression of Overton's state of mind, the testimony was admissible.

Evidence Code section 1250 provides that so long as the statement was not made under circumstances indicating lack of truthfulness, "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time

19

when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

The prosecutor elicited Overton's testimony about her prior statement to Echols about believing defendant to be guilty after the jury heard Overton gave conflicting reports about whether defendant had been with her at the time of the murders. Overton's state of mind was an important piece of evidence in determining which, if any, of her versions of the events on the night of the murders were reliable. On cross-examination, she noted she had lied to cover for defendant when she believed they were staying together as a married couple, and when intimidated by defendant's grandfather. Her state of mind in speaking with Echols about her preliminary hearing testimony was directly relevant and probative about the truthfulness of that earlier testimony.

Instructive on this point is the California Supreme Court's decision in *People v. Smithey* (1999) 20 Cal.4th 936 (*Smithey*). In *Smithey*, the prosecution asked a witness, Wayne Bunnell, about statements made by the murder victim, Cheryl Nesler, concerning her belief the defendant in that case had previously stolen a welder from her. (*Id.* at pp. 952, 971.) Over objection, the trial court admitted the evidence for the nonhearsay purpose of showing Cheryl's state of mind regarding the defendant. (*Id.* at p. 972.) On appeal, the defendant challenged the statement of Cheryl's belief in his responsibility for a prior theft on ground it was inadmissible hearsay that violated his rights to a fair trial. (*Id.* at pp. 971-972.) The Supreme Court affirmed, explaining the evidence "was admissible for the nonhearsay purpose of showing Cheryl's state of mind concerning defendant. (Evid. Code, § 1250, subd. (a)(1); *People v. Jones* (1996) 13 Cal.4th 535, 548.) Indeed, the prosecutor did not argue to the jury that defendant had stolen the welder, but rather asserted that Bunnell's testimony was important to show Cheryl's state of mind. Defendant testified that he had a friendly relationship with Cheryl, and that she

20

had invited him into her home on the day of the crime. Evidence that she thought defendant previously had stolen from her was admissible to impeach defendant's testimony in this regard. The circumstance that defendant did not testify until after Bunnell had testified does not change the conclusion on appeal that Bunnell's statements regarding Cheryl's state of mind were admissible." (*Smithey*, at p. 971.)

As in *Smithey, supra*, 20 Cal.4th 936, the challenged state-of-mind evidence in this case was admissible even though it involved an opinion regarding defendant's guilt. The record shows Overton's statements regarding defendant's whereabouts at the time of the murders correlated highly with her mental state. She gave alibi statements when she believed she and defendant were remaining together as a couple and when intimidated by defendant's grandfather. She withheld information about having sex and viewing pornography on the night of the murders due to embarrassment. Thus, her state of mind at the times she repudiated her alibi for defendant was highly relevant for the trier of fact to consider in assessing her truthfulness. To this end, the trial court properly informed the jury her answer could be used only to establish her state of mind. With the limiting instruction, the trial court did not err in allowing Overton to answer about her statements to Echols.

We reject defendant's assertion the jury could not have ignored testimony about Overton's belief in defendant's guilt. We presume the jury to have followed the trial court's limiting instruction. (*People v. Adcox* (1988) 47 Cal.3d 207, 253.) The trial court's instruction clearly limited the testimony to use for its value as to Overton's state of mind. Moreover, the testimony regarding her belief in defendant's guilt was less vivid than her testimony she sniffed defendant's clothing because he was acting so suspiciously on the morning of December 9, 2008, she imagined him having an extramarital affair. This also echoed her testimony defendant was "reeking" of guilt at that time. This

additional testimony was admissible because "[a] lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his [or her] testimony." (*People v. Farnam* (2002) 28 Cal.4th 107, 153; Evid. Code, § 800.) We conclude the limiting instruction sufficed to keep the jury from misusing Overton's testimony regarding her mindset.

Defendant asserts the prosecution ignored a prior court ruling to the effect Overton could be impeached with her statement to Echols if the defense first elicited her prior statement to the police that defendant was home all night. Defendant's assertion misconstrues the trial court's ruling. The court explained: "I think I told the People with regards to that KISS house employees generically, that they could ask . . . Overton did you make that statement. [¶] But that's really telling the district attorney how he can impeach the witness and I think he can either bring in Echols or Jeffries[4] or ask her directly. [¶] Because it does, in my mind, impeach her earlier statements that provide an alibi." Thus, the prosecution was not required to wait for the defense to raise the issue of prior inconsistent statements before being able to ask Overton about her statement to Echols. However, the record shows the prosecution did wait to ask Overton about this statement until the defense had thoroughly cross-examined her about prior inconsistent statements made to the police, at the preliminary hearing, and after the preliminary hearing.

In short, the prosecution committed no error in the timing or the substance of its questioning to Overton about her statements to Echols concerning her mindset.

---

**4**     Jennifer Jeffries was another KISS House employee.

22

## C.

### *Overton's Willingness to Wear a Secret Recording Device*

Defendant asserts the evidence of Overton's willingness to wear a secret recording device should have been excluded because "[t]he jury was likely to believe that Overton was privy to some marital communication or private evidence that supported her belief." We disagree.

As a general rule, "all relevant evidence is admissible in the trial court's sound discretion, except as limited by certain 'existing' exclusionary rules such as privilege and hearsay." (*People v. Wheeler* (1992) 4 Cal.4th 284, 293.) Overton's willingness to help the police in locating the boots was relevant in that it cast doubt on her earlier statements that provided an alibi for defendant at the time of the murders. One of the key issues at trial focused on which version of the events recounted by Overton represented the truth and which were fabrications. Overton's agreement to cooperate with the police tended to negate defendant's alibi defense.

Although defendant reiterates the concerns expressed by defendant's trial attorney during the hearing on motions in limine, the evidence as admitted at trial alleviated these concerns. The evidence showed Overton was willing to cooperate with the police by secretly recording discussions between the detectives and defendant about his missing work boots. However, neither the testimony of Detective Vigon nor the audio recording itself hinted there were additional confidential marital communications not played for the jury. Instead, the audio recording simply concerned the whereabouts of defendant's work boots.

The secret audio recording as described and played to the jury did not invite speculation of confidential communications being withheld from the jury. Nor did it amount to more than a small facet in the extensive evidence presented about defendant's

work boots. Defendant's concealment of the boots alleged by the prosecution to have been the footwear worn by defendant before and after he committed the murders was a major topic at trial. The evidence was relevant, admissible, and not inflammatory.

The trial court did not err in allowing the jury to hear a carefully circumscribed amount of evidence regarding defendant's denial that he still had the work boots or knew where they were located.

## II

### *Evidence Defendant Viewed Bestiality Pornography*

Defendant next argues the trial court erred by admitting testimony he and Overton viewed bestiality pornography shortly before the time of the murders. Specifically, defendant contends the testimony should not have been admitted as character evidence under Evidence Code section 1101, subdivision (b), and should have been excluded as unduly prejudicial under Evidence Code section 352. We reject the contentions.

### A.

### *Overton's Testimony Regarding Bestiality Pornography*

Contrary to defendant's assertion, Overton's testimony she and defendant viewed bestiality pornography on the night of the murders was not admitted as character evidence. Rather than being admitted as character evidence, Overton's testimony was elicited by the prosecutor to impeach her prior statements defendant had been with her the entire night.

During the preliminary hearing, Overton had stated she and defendant viewed only one pornography site –- a bestiality site –- for approximately 45 minutes until 3:45 a.m. when they engaged in sexual intercourse for approximately 45 minutes. Defendant and Overton then went outside to smoke a cigarette before going to bed together. This

24

testimony at the preliminary hearing contradicted the People's theory of the case, which was that defendant committed the murders sometime between 4:00 and 7:00 a.m.

To cast doubt on Overton's alibi testimony at the preliminary hearing, the prosecution sought to introduce evidence defendant visited approximately 40 pornography Websites between 11:33 p.m. on December 8, 2008, and 1:51 a.m. on December 9. Defendant's computer was not used to view any additional Websites until 7:47 a.m. when it accessed a news Website and a children's game. The defense objected to any mention of the content, names, and titles of the pornographic Websites accessed. The People responded that it was important for the jury to know about the nature and variety of the Websites accessed by defendant because it contradicted Overton's statement they had only accessed one site together and tended to show they did not have sex that night. After a hearing on the issue, the trial court ruled the prosecution's expert witness "could say generically there were 'x' sites searched between this time that have absolutely nothing to do [with] bestiality." At trial, the defense again urged the court to rule Overton could only generically mention a pornography site because any reference to bestiality pornography would be prejudicial. The trial court overruled the objection and reiterated its prior ruling Overton could mention viewing a bestiality pornography site.

Overton testified defendant liked to watch pornography. The prosecutor then followed up with the following questioning:

"Q. Okay. So is it his idea, your idea?

"A. [by Overton]: I don't remember whose idea it was. I mean it was –- initially it –- I don't remember. I really don't.

"Q. Okay. And the pornography that you were watching, is there a type of pornography that you're watching?

"A. We did go to a bestiality site, yes.

25

"Q. You went to a single bestiality site?

"A. That I can recall, yes.

"Q. And how long did you spend on the bestiality site?

"A. I don't remember.  20 minutes maybe."

Additional questioning revealed Overton did not remember viewing any other sites on the late evening and early morning prior to the murders.

Sacramento Police Department Detective Debbie Mello testified she examined defendant's computer for past Internet activity.  On December 8, 2008, the computer was used at 11:46 p.m. to access a "lawful adult pornography" Website that did not have to do with bestiality.  Several more Internet searches for non-bestiality pornography were conducted until the first Web search for bestiality Websites was conducted at 12:40 a.m.  From 12:40 until 12:51, sites concerning bestiality pornography were accessed.  From 12:51 until 1:45 a.m., the computer was used to access several non-bestiality, lawful adult pornography Websites.  After 2:04 a.m., no other pornography sites were accessed.

The jury was instructed it could not consider the testimony regarding pornography as character evidence.  The trial court told the jury:  "You heard evidence of lawful adult pornography and bestiality.  This evidence was offered as to who was or was not viewing this material, and at what times it may have been viewed.  [¶]  You may consider this evidence for this purpose only.  This evidence may not be considered by you, as evidence of bad character."

## B.

### *Evidence Code section 1101, subdivision (a)*

Evidence Code section 1101, subdivision (a), makes admissible –- with certain exceptions –- "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his

26

or her conduct) . . . when offered to prove his or her conduct on a specified occasion." Defendant contends Overton's testimony regarding their viewing of bestiality pornography was erroneously admitted as evidence of his bad character. However, Overton's testimony on this point at trial was not admitted as character evidence. Instead, her testimony was allowed by the trial court to show she did not see many of the pornographic bestiality sites that would presumably not be easily forgotten. In effect, Overton's testimony about viewing a single bestiality site undermined the value of her statements as an alibi for defendant because they showed, at least, she was not with him for a substantial amount of time. In this context, her testimony was not character evidence. Moreover, the trial court admonished the jury that the evidence regarding the viewing of bestiality pornography could not be used as evidence of defendant's bad character. We presume the jury heeded this admonishment. (*People v. Adcox*, *supra*, 47 Cal.3d at p. 253.)

## C.

### *Evidence Code section 352*

Evidence Code section 352 provides that the trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." A trial court's exercise of discretion under Evidence Code section 352 is reviewed for abuse of discretion " 'and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)" (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

Defendant argues the evidence concerning his viewing of bestiality pornography was so inherently prejudicial it denied him a fair trial. He further argues the prosecutor's repeated references during closing arguments to bestiality pornography were prejudicial. We are not persuaded.

The testimony regarding Overton's viewing of bestiality pornography was directly relevant to the prosecution's impeachment of her version of the events on the night of the murder that included having sex with defendant until approximately 4:15 a.m. If Overton viewed only one bestiality pornography Website, it established she was not with defendant for most of the time from midnight until 2:00 a.m. on the night of the murders. Moreover, the access of additional adult pornography Websites tended to dispel the validity of her assertion she and defendant had sex that evening. Thus, the testimony was highly relevant to a central issue of the case, namely the reliability of her alibi for defendant at the time of the murders.

The evidence of bestiality pornography was not unduly inflammatory. According to the testimony of Detective Mello, the bestiality pornography sites were accessed for only a very short time: approximately nine minutes during a two-hour session of viewing pornography. So too, Overton testified she and defendant spent only 20 minutes viewing the bestiality pornography during the time when they engaged in sexual intercourse. The testimony from both Detective Mello and Overton concerning the bestiality pornography was brief and did not relate any details about the sites visited. The purpose of the evidence was clear: to impeach Overton's earlier testimony.

Moreover, defendant's assertion of prejudice from the testimony regarding bestiality pornography cuts against Overton. She testified that she watched it with defendant while they had sex. However, she did not state defendant was the person whose idea it was to view it or that she disapproved of its content. To the contrary, she

28

stated, "*We* did go to a bestiality site, yes." (Italics added.) Moreover, Overton stated the bookmarks for Websites on the computer were hers. In short, any inherent prejudice from the bestiality pornography would have manifested in the rejection of the prosecution's most important witness.

Defendant also contends the prosecutor's repeated references to bestiality and bestiality pornography during closing arguments were additionally prejudicial. However, defense counsel did not object and request any admonishment for the mention of the terms bestiality and bestiality pornography. Accordingly, any contention regarding prejudice from the prosecutor's closing argument is forfeited. (*People v. Dykes* (2009) 46 Cal.4th 731, 767.) Moreover, as defendant concedes, the prosecutor did not argue that viewing bestiality pornography was evidence of such deviance or depravity it proved defendant killed his parents. In any event, our review of the prosecutor's closing arguments shows the mentions of bestiality pornography were made in the context of arguing against Overton's alibi statements. Neither the prosecutor's arguments nor the testimony regarding the viewing of bestiality pornography denied defendant a fair trial.

## III

### *Whether the Prosecution's Rebuttal Argument Constituted Misconduct*

Defendant contends the prosecutor committed misconduct during closing arguments when he stated there was no evidence someone other than defendant committed the murders, and defendant could have presented such evidence if it existed. We disagree.

### A.

### *Closing Arguments*

In pertinent part, defendant's trial attorney told the jury during closing argument:

"[Defendant] doesn't have to prove his innocence. . . . We are used to listening to two sides and coming from two angles, and you will notice the district attorney even invited you not to follow that presumption of innocence. [¶] He said there is nothing showing he didn't do this. That's not the presumption of innocence. [¶] The defendant has no alibi. That's not the presumption of innocence. We don't have to show an alibi. [¶] He even says . . . the defense will say somebody else did it. Look for the evidence of that, and I told you in jury selection, we're not allowed to present evidence of other people." (Italics omitted.)

After defense counsel's closing argument and outside the presence of the jury, the prosecutor objected to defense counsel's assertions he invited the jury not to follow the law or tried to shift the burden to the defense. The prosecutor announced he intended to address the points in his rebuttal argument. Defendant's trial attorney responded, "I think it's inappropriate to say that the defense can present evidence somebody else did it when in fact there has been a ruling in this case that precludes that, and I understand that that ruling was in compliance with Hall[5] and the other cases, but the jury is not going to know about that . . . ." The trial court overruled the objection and allowed the prosecutor to address the issue. During rebuttal, the prosecutor argued:

"The defense claimed in the beginning of this argument the DA invited you not to follow the law by arguing that there is nothing showing he didn't do it.

"Well, guess what? In this case at the end of the case, you get to decide the facts of the case, and you compare and contrast it from all of the evidence.

"One of the things that's very compelling in this case is there is no other evidence that suggests that it –- that anyone else did this. There is no other evidence. That's not

---

**5**     See *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*).

burden shifting.  The burden is still on me, but if you eliminate the fact that there is nothing of anyone else connected to the scene, there is no bloody print left on that back door of the killer going out and using the back door as the way to get out, there are no bloody footprints going back over the fence across the way in the backyard, those things help show that it was [defendant].  It narrows down the spectrum.

"The defense claimed that we invited you not to follow the law.  Obviously we invited you to follow the law.  The law is to hold us to proof beyond a reasonable doubt. You consider all of the points in the case.

"The defense claims someone else did do it, but we are not allowed to present evidence of other people.  That's not the law.  The defense can't present speculation.  We can't have grandpa get up there and speculate, well, I thought it was someone from work, without having evidence that shows it.  So it's true.  You cannot have witnesses get up and speculate well, it could have been somebody else.  But if they had a hint of evidence that directly linked somebody to this crime, that showed it was somebody else, in America, you are allowed to present that evidence.

"The absence of that evidence in this case tells you a lot."  (Italics omitted.)

**B.**

***Comments on the Defense's Lack of Material Evidence***

As the California Supreme Court has explained, " 'a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 679, quoting *People v. Riggs* (2008) 44 Cal.4th 248, 298.)  Under the federal constitution, prosecutorial misconduct results if "the challenged action ' "so infected the trial with unfairness as to

31

make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181, 91 L.Ed.2d 144.)" (*People v. Riggs, supra*, at p. 298.) Thus, a prosecutor must refrain from misstating the law or impermissibly seeking to shift the burden of proof to a criminal defendant. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339 (*Bradford*).)

However, a prosecutor may comment on the state of the evidence as well as the failure of a defendant to introduce material evidence. (*Bradford*, *supra*, 15 Cal.4th at p. 1339.) In *Bradford*, the California Supreme Court considered the issue of comments made by the prosecution during closing arguments to point out the defendant had not introduced any evidence of innocence and no evidence contradicted key parts of the People's case. (*Id.* at pp. 1338-1339.) The *Bradford* court determined the challenged closing arguments to be permissible, noting the prosecutor "reiterated that the prosecution had the burden of proof by sufficient evidence to establish defendant's guilt, and that defendant had no duty or burden to produce any evidence. (See *People v. Ratliff* (1986) 41 Cal.3d 675, 691.) A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*Id.* at p. 1340.)

As in *Bradford*, the prosecutor in this case clearly stated the People had the burden of proving defendant committed the charged offenses beyond a reasonable doubt. (*Bradford*, *supra*, 15 Cal.4th at p. 1340.) Additionally, the prosecutor urged the jury to follow the law. The trial court instructed the jury with CALCRIM No. 220, which explained it could not convict defendant unless the evidence proved him guilty beyond a reasonable doubt.

The prosecutor did comment on the failure of defendant to adduce any evidence and stated a defendant may not introduce merely speculative evidence in an effort to shift culpability to a third party. However, these comments were not error. "To be admissible, the third party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra,* 41 Cal.3d at p. 833.) The prosecutor did not err by pointing out in rebuttal that a criminal defendant is allowed to introduce nonspeculative exonerating evidence but the defense did not do so in this case.

The prosecutor's challenged rebuttal argument did not amount to misconduct.

## IV

### *Parole Revocation Restitution Fine (§ 1202.45)*

The Attorney General notes the trial court erred in imposing a parole revocation restitution fine because defendant's sentence does not include a period of parole. The point is well taken. Defendant received two sentences of life imprisonment without possibility of parole. Defendant is not subject to the fine imposed under section 1202.45, subdivision (a), which applies only "where a person is convicted of a crime and his or her sentence includes a period of parole." Accordingly, we strike this fine.

## DISPOSITION

Defendant's convictions are affirmed. The parole revocation restitution fine imposed under Penal Code section 1202.45 is stricken. As modified, the judgment is

affirmed.  The superior court clerk is directed to prepare an amended abstract of judgment, and to forward a certified copy to the Department of Corrections and Rehabilitation.


                                                 HOCH    , J.


We concur:


        BUTZ    , Acting P. J.


     MURRAY   , J.